# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

LATOYA JOHNSON, INDIVIDUALLY AND
AS PERSONAL REPRESENTATIVE OF THE DECEDENT,
ROBERT WAYNE JOHNSON, FOR AND ON BEHALF OF ALL
WRONGFUL DEATH BENEFICIARIES AND
AS ADMINISTRATRIX OF THE ESTATE OF
ROBERT WAYNE JOHNSON, DECEASED

PLAINTIFF

V.                                                          CIVIL ACTION NO. 3:19-cv-700-CWR-LRA

KEMPER COUNTY, MISSISSIPPI;
SHERIFF JAMES MOORE, INDIVIDUALLY AND
IN HIS OFFICIAL CAPACITY AS THE SHERIFF
OF THE KEMPER COUNTY, MISSISSIPPI SHERIFF'S
DEPARTMENT;
LIEUTENANT MARQUICE COLLINS,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY;
CORRECTIONAL OFFICER ERIC MCCOY, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY;
CORRECTIONAL OFFICER KEM HICKS, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY;
CORRECTIONAL OFFICER AARON HALL, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY;
AND WARDEN JOHNNY CROCKETT,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY

DEFENDANTS

---

## COMPLAINT
### Jury Trial Demanded

---

COMES NOW the Plaintiff, LaToya Johnson, individually and as a personal

representative of the decedent, Robert Wayne Johnson, for and on behalf of all wrongful death

beneficiaries, and as Administratrix of the Estate of Robert Wayne Johnson, and complains as follows:

**PARTIES**

1.   Plaintiff, LaToya Johnson, is an adult Mississippi resident residing at 3816 37th Street, Meridian, Mississippi 39305.  Plaintiff is the widow of Robert Wayne Johnson and brings this action individually and as a wrongful death beneficiary of Robert Wayne Johnson, deceased, on behalf of all of the wrongful death beneficiaries of Robert Wayne Johnson, and on behalf of the Estate of Robert Wayne Johnson as Administratrix thereof.

2.   Defendant Kemper County, Mississippi, is a political subdivision of the State of Mississippi and may be served with process by service upon its Chancery Clerk, Shirlene Watkins, 280 Veterans Street, De Kalb, Mississippi 39328.

3.   Defendant, Sheriff James Moore, is the duly elected Sheriff of Kemper County and can be served with process at 330 Stennis Industrial Park Road, De Kalb, Mississippi 39328.  At all material times, Defendant Moore was the Sheriff of Kemper County, Mississippi, vested with the responsibility and authority to hire, train, supervise, set, adopt, implement, and enforce policies and procedures at the Kemper-Neshoba Regional Correctional Facility ("KNRCF") and to provide protection to the citizens of Kemper County, Mississippi, and the state of Mississippi, including Robert Johnson. Defendant Moore is sued in his official and individual capacities. Defendant Moore, at times material hereto, was acting under color of state law in his official capacity as the Sheriff of Kemper County, Mississippi, and the actions of Defendant Moore were done and performed under the color and pretense of the ordinances, regulations, policies, customs, and usages of Kemper County, Mississippi and the State of Mississippi.

4.   Defendant Marquice Collins is sued in his individual capacity as an employee of the Kemper County Sheriff's Department.  Collins can be served with process at 374 Stennis Industrial Park Road, De Kalb, Mississippi 39328, or wherever he may be found.  Defendant Collins, at all times material hereto, was acting under color of state law in his official capacity as an officer with the Kemper County Sheriff's Department, and the actions of Defendant Collins were done and performed under the color and pretense of the ordinances, regulations, policies, customs, and usages of Kemper County, Mississippi and the State of Mississippi.

5.   Defendant Eric McCoy, is sued in his individual capacity as an employee of the Kemper County Sheriff's Department.  McCoy can be served with process at 374 Stennis Industrial Park Road, De Kalb, Mississippi 39328, or wherever he may be found.  Defendant McCoy, at all times material hereto, was acting under color of state law in his official capacity as an officer with the Kemper County Sheriff's Department, and the actions of Defendant McCoy were done and performed under the color and pretense of the ordinances, regulations, policies, customs, and usages of Kemper County, Mississippi and the State of Mississippi.

6.   Defendant Kem Hicks is sued in his individual capacity as an employee of the Kemper County Sheriff's Department.  Hicks can be served with process at 374 Stennis Industrial Park Road, De Kalb, Mississippi 39328, or wherever he may be found.  Defendant Hicks, at all times material hereto, was acting under color of state law in his official capacity as an officer with the Kemper County Sheriff's Department, and the actions of Defendant McCoy were done and performed under the color and pretense of the ordinances, regulations, policies, customs, and usages of Kemper County, Mississippi and the State of Mississippi.

7.   Defendant Aaron Hall is sued in his individual capacity and as an employee of the Kemper County Sheriff's Department.  Hall can be served with process at 374 Stennis Industrial

Park Road, De Kalb, Mississippi 39328, or wherever he may be found.  Defendant Hall, at all times material hereto, was acting under color of state law in his official capacity as an officer with the Kemper County Sheriff's Department, and the actions of Defendant Hall were done and performed under the color and pretense of the ordinances, regulations, policies, customs, and usages of Kemper County, Mississippi and the State of Mississippi.  Hall can be served with process at 123 Main Avenue, De Kalb, Mississippi 39328, or wherever he may be found.

8.  Defendant, Johnny Crockett, is sued in both his individual capacity and in his official capacity as an employee of the Kemper County Sheriff's Department and Warden of KNRCF. Crockett can be served with process at 374 Stennis Industrial Park Road, De Kalb, Mississippi 39328, or wherever he may be found.  Defendant Crockett, at all times material hereto, was vested with the responsibility and authority to hire, train, supervise, set, adopt, implement, and enforce policies and procedures at KNRCF, was acting under color of state law in his official capacity as an officer with the Kemper County Sheriff's Department.  The actions of Defendant Crockett were done and performed under the color and pretense of the ordinances, regulations, policies, customs, and usages of Kemper County, Mississippi and the State of Mississippi.

**JURISDICTION**

9.  This Court has jurisdiction pursuant to 28 U.S.C. §1331 as this action arises under the laws of the United States, specifically 42 U.S.C. §1983 and the Eighth and Fourteenth Amendment of the United States Constitution.

10. Venue is proper in the Eastern Division of the Southern District of Mississippi pursuant to 28 U.S.C. §1391(b) as one or more defendants reside in Kemper County and a substantial part of the events or omissions giving rise to the claim occurred in Kemper County.

## FACTS

11. Robert Wayne Johnson was a resident of Meridian, Mississippi.  He was married to Plaintiff LaToya Johnson and was the father of five children. He worked at the Meridian Public Library, the East Mississippi State Hospital, and at Tower Automotive. Mr. Johnson struggled with mental health issues, was admitted for mental health inpatient services on at least two occasions, and had unsuccessfully attempted suicide during the years leading up to his death.

12. On or around November 16, 2017, Mr. Johnson was sentenced by Judge Robbie Jones of the City of Meridian Municipal Court to two days of incarceration and 199 hours of community service for failure to pay fines and fees to the City of Meridian.  Mr. Johnson, who had lost his job earlier in 2017, was too poor to pay those fines.  The City of Meridian had an agreement with Kemper County pursuant to which certain people sentenced in Meridian Municipal Court were housed at KNRCF.  Mr. Johnson was sent to KNRCF by the City of Meridian to serve his two days in jail.

13. Mr. Johnson did not receive an appropriate mental health screening upon arrival at KNRCF or at any time thereafter sufficient to determine his mental health condition and whether he was suicidal.

14. Mr. Johnson's release date from KNRCF should have been November 18, 2017.  Due to the failure of Defendants to properly monitor release dates and Defendants' resulting failure to release Mr. Johnson after two days as instructed by the Meridian Municipal Court, he was unlawfully imprisoned an additional 52 days until he died at KNRCF on January 9, 2018.

15. While at KNRCF, Mr. Johnson was housed in "Dorm 2" where he was subjected to 24-hour video surveillance monitored by an officer in Central Control. Unlike Dorm 2 and other areas within KNRCF, there was no video camera in State Observation Cell 126 at KNRCF.  State

Observation Cell 126 is a room at KNRCF where detained persons are sometimes sent to be separated from other inmates and observed by the jail staff.

16. During the days leading up to January 9, 2018, Mr. Johnson expressed concern to fellow inmates about his charges and mistakenly believed that he was subject to serious felony charges.

17. During the days leading up to January 9, 2018, Mr. Johnson would tear his towel into strips and tie the strips around his neck.  On several occasions during that period when Mr. Johnson would retrieve his food tray from jail staff, he would have towel strips tied around his neck.  The towel strips tied around Mr. Johnson's neck were plainly visible to jail staff, and the room in which Mr. Johnson was incarcerated while tying these strips around his neck was subject to 24-hour video surveillance observed by jail staff in Central Control.

18. On the afternoon of January 9, 2018, Mr. Johnson tied one of his shoelaces around his neck and pulled it tightly with both hands in a manner simulating hanging or strangulation.  The room in which Mr. Johnson was incarcerated while tying his shoelace around his neck and pulling upward in a hanging or strangulation manner was subject to 24-hour video surveillance observed by jail staff in Central Control.

19. During the evening of January 9, 2018, Mr. Johnson used a razor blade to cut both his wrists.

20. Inmate Jericho Williams observed Mr. Johnson cutting his writs on the evening of January 9, 2018, and he advised other inmates located in the same housing unit.  Inmate Andre Strong took the razor blade away from Mr. Johnson and threw it in the garbage.

21. At approximately 10:00 p.m., immediately after Strong threw away the razor blade Mr. Johnson had been using to cut his wrists, Strong and other inmates alerted Central Control,

which was being operated by Defendant Collins at the time, that "they needed an officer down here."

22. Defendant Collins ordered Defendants McCoy, Hicks, and Hall to respond to Strong's request that jail staff address Mr. Johnson's wrist cutting. Officer Hicks was the first to arrive and was shown by inmate Andre Strong that Mr. Johnson had been cutting his wrists with a razor blade.

23. Inmates in Dorm 2, where Mr. Johnson was housed, informed Defendants McCoy, Hicks, and Hall that earlier in the day Mr. Johnson had been tying his shoe strings around his neck and pulling upward in a hanging or strangulation motion.

24. Defendant McCoy and/or Defendant Hicks informed Defendant Collins by radio that Mr. Johnson did not wish to leave Dorm 2. Defendant Collins advised Defendant McCoy and/or Defendant Hicks that Mr. Johnson should be left in Dorm 2. Defendant Collins made this decision unilaterally and did not consult with any higher-ranking officer or any mental health or other health care professional. Defendants McCoy, Hicks, and Hall were aware that Defendant Collins did not seek input from any higher-ranking officer or medical professional in determining to allow Mr. Johnson to remain in Dorm 2.

25. Defendants McCoy, Hicks, and Hall permitted Mr. Johnson to remain in Dorm 2 as instructed by Defendant Collins and exited the Dorm. Mr. Johnson then expressed frustration with inmate Strong for informing the jail staff that Johnson had been cutting his wrists. Mr. Johnson approached Strong in an aggressive manner, and inmate Strong easily deflected the advances of the much older and weaker Mr. Johnson. Eventually, inmate Donald Naylor stepped in the middle of Strong and Mr. Johnson and subdued Mr. Johnson on the ground.

26. At approximately 10:14 p.m., Defendant Collins observed the scuffle on the Central Control cameras and instructed Defendants Hicks, Hall, and McCoy to return to Dorm 2 and transport Mr. Johnson and his property from Dorm 2 to State Observation Cell 126.

27. Upon arriving at Dorm 2, Defendants Hall, Hicks, and McCoy saw that Mr. Johnson was highly agitated.  They removed Mr. Johnson from Dorm 2, and then Defendant Hall detained Mr. Johnson in the hallway while Defendants Hicks and McCoy reentered Dorm 2 to gather Mr. Johnson's belongings.

28. Defendants Hicks and McCoy began placing Mr. Johnson's belongings in a rolling laundry cart.  During that process, multiple inmates expressly informed Defendants Hicks and McCoy that they should not let Mr. Johnson have his shoelaces because Mr. Johnson had tied them around his neck earlier in the day and pulled upward in a hanging or strangulation motion. Inmates also expressed concern that Mr. Johnson would use his shoelaces to harm himself. Defendants Hicks and McCoy responded, "Alright."  Despite being told of Mr. Johnson's actions with the shoelaces earlier in the day, Defendants Hicks and McCoy included the shoestrings among Mr. Johnson's belongings collected in the rolling laundry cart.

29. While Defendants McCoy and Hicks were retrieving Mr. Johnson's property, Defendant Hall forced Mr. Johnson to the ground in the hallway outside Dorm 2 and held him there until Defendants McCoy and Hicks returned. After Defendants McCoy and Hicks returned with the laundry cart, the Defendants Hall, McCoy, and Hicks forcibly deposited Mr. Johnson into the laundry cart with his belongings, including his shoelaces, and rolled the cart to State Observation Cell 126.  Defendants Hall, McCoy, and Hicks knew that Mr. Johnson's shoelaces were in the laundry cart.

30. Jail staff made an entry in the KNRCF Unit Register indicating that Mr. Johnson was moved from Dorm 2 to State Observation Cell 126 "due to Mental Issues / Behavioral Issues."

31. Mr. Johnson was placed in State Observation Cell 126 with all of his belongings, including his shoelaces, at approximately 10:23 p.m.  Mr. Johnson did not want to be left in State Observation Cell 126, and he attempted to exit the door as the Defendants Hall, Hicks, and McCoy walked out.  The three officers pushed Mr. Johnson back from the door and slammed the door shut as Mr. Johnson was struggling to leave.

32. State Observation Cell 126 is an isolation room used for inmates separated from the general population. There is not a camera in State Observation Cell 126.  The cell has a toilet and beds with metal bedframes.  State Observation Cell 126 is adjacent to Central Control, and a window is located on the wall that connects State Observation Cell 126 and Central Control. The video screens monitored by the officer manning the Control Center are positioned such that the officer's back is to the window between the Control Center and State Observation Cell 126.  It is not possible to observe the video screens while looking through the window into State Observation Cell 126.

33. While Mr. Johnson was in State Observation Cell 126, no jail staff observed him either through direct personal observation or video monitoring.  Mr. Johnson was left alone in State Observation Cell 126 with the items that had been placed into the rolling laundry cart by Defendants Hall, Hicks, and McCoy, including Mr. Johnson's shoelaces.  Despite the fact that KNRCF had a written suicide observation and prevention policy that required constant supervision of suicidal "offenders," that policy was not implemented in regard to Mr. Johnson. Mr. Johnson was not placed on suicide watch by jail staff, and no suicide prevention measures were undertaken by anyone at KNRCF.

34. At approximately 10:37 p.m., after Mr. Johnson had been left unobserved for nearly fifteen minutes, Defendant Collins rose from his seat in the Control Center, turned his back to the video screens he had been monitoring, and looked through the window into State Observation Cell 126.  Defendant Collins observed Mr. Johnson sitting on the floor with his back against the bed and his eyes facing the observation window.  Defendant Collins attempted to get Mr. Johnson's attention by banging on the window, but Mr. Johnson was unresponsive.  Defendant Collins noticed what appeared to be a shoelace tied around his Mr. Johnson's neck.  He then radioed Defendants Hall, Hicks, and McCoy and instructed them to check on Mr. Johnson.

35. Officers McCoy, Hall, and Hicks entered State Observation Cell 126 at approximately 10:39 p.m.  Upon entering, they discovered that Mr. Johnson had hung himself by wrapping his shoelace around his neck and tying it to the bed frame.  Defendant Hicks then walked out of the room to retrieve scissors so the officers could cut the shoelaces. During Defendant Hicks's absence, Defendants McCoy and Hall tried to break the shoelaces but were unsuccessful.

36. Defendant Hicks returned with scissors at approximately 10:41 p.m. After cutting Mr. Johnson from the bed post, the officers dragged Mr. Johnson out of State Observation Cell 126 and began performing chest compression in an attempt to revive him.  By this time, Lt. Collins arrived at the scene and began attaching the Automated External Defibrillator (AED) to Mr. Johnson.  However, due to the absence of a heartbeat, the AED instructed the officers to perform CPR. The officers continued CPR until EMS arrived at approximately 10:59 p.m.

37. EMS transported Mr. Johnson to John Stennis Hospital at approximately 11:18 p.m. Upon arriving at the hospital, Mr. Johnson was pronounced dead.

38. Defendant Moore spoke to the media on January 10, 2018, the day after Mr. Johnson death.  Sheriff Moore told reporters that Mr. Johnson "was threatening to harm himself" and

"was moved into observation because he was trying to hurt himself." Moore also stated that he knew Mr. Johnson's last known address was the East Mississippi State Hospital, a state-run institution that provides care to mentally ill individuals. Moore admitted further, "I know he [Mr. Johnson] had a history of mental illness."

## CAUSES OF ACTION

## COUNT I

### Failure to Protect - Violation of the Fourteenth Amendment under 42 U.S.C. § 1983

39. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

40. Count I is alleged against all the individual Defendants.

41. Because Mr. Johnson should have been released prior to his death on January 9, 2018, his claims herein should be considered under the Fourteenth Amendment of the United States Constitution.

42. Under settled United States Supreme Court authority, and in accordance with the Fourteenth Amendment, Mr. Johnson was entitled to be free from a known and unreasonable risk of serious harm while in the custody of the Kemper-Neshoba Regional Correctional Facility.

43. In violation of the Fourteenth Amendment, the individual Defendants knew of and disregarded a substantial risk of serious harm—that Mr. Johnson would commit suicide.

44. The individual Defendants' above-described actions and omissions were undertaken with malice and/or reckless disregard for Mr. Johnson's constitutional rights, and the individual Defendants acted with deliberate indifference for the rights of Mr. Johnson.

45. As a result of the unjustified and unconstitutional conduct of the individual Defendants, Mr. Johnson experienced pain, suffering, emotional distress, injury, and ultimately, death.

46. The Defendants' actions and omissions were the direct and proximate cause of the violations of Mr. Johnson's constitutional rights, of Mr. Johnson's death, and of the damages suffered by him and his heirs.

## COUNT II

### Failure to Protect - Violation of the Eighth Amendment under 42 U.S.C. § 1983

47. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

48. Count II is alleged against all the individual Defendants.

49. In the alternative to Count I, if Mr. Johnson was a properly-incarcerated person at the time of his death, his claims herein should be considered under the Eighth Amendment of the United States Constitution.

50. Under settled United States Supreme Court authority, and in accordance with the Eighth Amendment, Mr. Johnson was entitled to be free from a known and unreasonable risk of serious harm while in the custody of the Kemper-Neshoba Regional Correctional Facility.

51. In violation of the Eighth Amendment, the individual Defendants knew of and disregarded a substantial risk of serious harm—that Mr. Johnson would commit suicide.

52. The individual Defendants' above-described actions and omissions were undertaken with malice and/or reckless disregard for Mr. Johnson's constitutional rights, and the individual Defendants acted with deliberate indifference for the rights of Mr. Johnson.

53. As a result of the unjustified and unconstitutional conduct of the individual Defendants, Mr. Johnson experienced pain, suffering, emotional distress, injury, and ultimately, death.

54. The Defendants' actions and omissions were the direct and proximate cause of the violations of Mr. Johnson's constitutional rights, of Mr. Johnson's death, and of the damages suffered by his heirs.

## COUNT III

### *Monell* Claim Under 42 U.S.C. § 1983

55. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

56. Count III is alleged against Defendant Kemper County and Defendants Moore and Crocket in their official capacities.

57. Defendant Kemper County and Defendants Moore and Crockett, individually and together, acted under color of state law to violate Mr. Johnson's rights to due process, equal protection of the laws, and the right to be free from cruel and unusual punishment as protected by the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. Defendants wholly and completely failed to adopt and implement adequate policies and procedures to detect and respond to the obvious medical and mental health needs of arrestees and inmates with mental health issues. During all times relevant to this complaint, the policies, practices, or customs of Defendant Kemper County and the jail staff at KNRCF, with the approval or acquiescence of Defendants Moore and Crockett, were inadequate to protect and keep safe those incarcerated at KNRCF as required by law. The failures of defendants include, but are not limited to, failing to conduct appropriate mental health screenings; placing suicidal inmates in segregation cells with personal belongings, such as shoelaces, that could be used to inflict harm to themselves or others; ignoring or failing to detect evidence that persons detained at KNRCF are suicidal; permitting jail staff to make determinations regarding the risk presented by self-mutilation without obtaining input from persons qualified to assess suicide risk; and placing suicidal persons in segregation cells with no video monitoring and without constant observation by jail staff.

58. The above-described widespread practices, which were so well settled as to constitute the de facto policies of Defendants, were allowed to exist because policymakers with authority over KNRCF, jail staff, and the people housed at KNRCF exhibited deliberate indifference to the problems arising therefrom, thereby effectively ratifying the policies and failing to protect those housed at KNRCF as required by law. The polices, practices, and customs set forth above were the driving force behind the numerous constitutional violations in this case that directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth herein.

### Count IV
### Failure to Train/Supervise Under 42 U.S.C. § 1983

59. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

60. Defendant Kemper County and Defendants Moore and Crockett, individually, are also liable because the actions of the individual Defendants were carried out pursuant to an official policy or custom of the Sheriff's Department and County, and said policy or custom was the moving force behind the deprivation of Robert Johnson' constitutional rights.

61. Defendant Kemper County is also liable for the actions of Defendant Moore and/or Crockett, who were together, or individually, the ultimate policymakers for the Department and who implemented the policy or custom at issue. Sheriff Moore also played a direct role in the failure to care for Robert Johnson, and his actions evidence deliberate indifference for the health, safety, and well-being of Robert Johnson.

62. The standard for suicide prevention prescribed by the National Commission on Correctional Health Care states that "All staff members who work with inmates [should be] trained to recognize verbal and behavioral cues that indicate potential suicide, and how to

14

respond appropriately." Furthermore, inmates that exhibit suicidal tendencies should not be left in segregation/isolation, unless they are under constant supervision.

63. Defendants Moore and/or Crockett failed to adequately train and supervise the KNRCF staff regarding how to recognize suicidal behavior and provide appropriate medical attention. All of these actions constitute deliberate indifference and reckless disregard for the health and well-being of Robert Johnson on the part of Defendant Kemper County and on behalf of Defendants Moore and Crocker, in their official and individual capacities.

64. The above-described practices, customs, and usages, which were so well settled as to constitute the de facto policy of Defendant Kemper County, were allowed to exist because policymakers with authority over their acts exhibited deliberate indifference to the problem, thereby effectively ratifying it. The polices, practices, and customs set forth above were the driving force behind the numerous constitutional violations in this case that directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth herein.

## COUNT V

### Unlawful Detention in Violation of Fourteenth Amendment Under 42 U.S.C. § 1983

65. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

66. Mr. Johnson was transported to KNRCF on November 16, 2017 to serve a two-day sentence for failure to pay fines and fees.  At that time, Mr. Johnson had clearly established substantive and procedural constitutional rights to be free from a deprivation of his liberty without due process of law.

67. Rather than being released on November 18, 2017, Mr. Johnson was detained at KNRCF until his death on January 9, 2018.

68. Mr. Johnson's incarceration for 52 days beyond his lawful release date violated his substantive and procedural Fourteenth Amendment due process right to liberty.

69. It was the responsibility of the county, acting through the ultimate policymaking authority of Defendant Moore, to properly implement court orders and to make certain that those detained in county jails were not held beyond their release dates as established by sentencing courts.

70. Defendant Moore is liable to Plaintiff for violation of Mr. Johnson's substantive and procedural Fourteenth Amendment due process right to liberty. Defendant Moore was acting under color of state law, acted with deliberate indifference for the constitutional rights of Mr. Johnson, and his conduct caused damages to Mr. Johnson arising from his unlawful detention.

71. Defendant Kemper County, through the actions and omissions of its final policymaking official, Defendant Moore, is liable to Plaintiff for its policy, practice, custom, or usage of denying Mr. Johnson his substantive and procedural Fourteenth Amendment due process to liberty as described herein.

## COUNT VI

## Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132

72. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

73. Count VI is alleged against Defendant Moore in his official capacity. Mr. Johnson suffered from a long history of mental illness and had been diagnosed with major depressive disorder with psychotic features. This condition affected Mr. Johnson's daily living, his ability to work, and his relationship with his family. Mr. Johnson, as someone who suffered from major depressive disorder with psychotic features, qualified as a person with a disability under the Americans with Disabilities Act, and his disability was known to Defendants. As a result,

Defendants had an obligation to accommodate his disability by housing him in a suicide-proof segregation cell that provided for constant monitoring and did not allow him access to dangerous instrumentalities such as shoelaces. The Defendants intentionally failed to accommodate Mr. Johnson's disability, and these failures led to Mr. Johnson's death.

## IV. DAMAGES

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor against Defendants, awarding compensatory damages, costs and attorneys' fees, and punitive damages against each of the Defendants in their individual capacities, and for such further additional relief as this Court may deem appropriate and just.

Dated September 30, 2019.

Respectfully submitted,

LaToya Johnson,
By and through her counsel of record,
Cliff Johnson (MSB #9383)
MACARTHUR JUSTICE CENTER
University of Mississippi School of Law
481 Chucky Mullins Drive
University, Mississippi 38677
P: 601-915-6863
cliff.johnson@macarthurjustice.org

Victor I. Fleitas, P.A.
452 North Spring Street
Tupelo, Mississippi 38804
662.840.0270 / Telephone
662.840.1047 / Facsimile
fleitasv@bellsouth.net / Email