IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**LATOYA JOHNSON**                                                                             **PLAINTIFF**

**v.**                            **CIVIL ACTION NO.: 3:19-CV-700-TSL-LGI**

**KEMPER COUNTY, MISSISSIPPI, ET AL.**                     **DEFENDANTS**

### DEFENDANT'S REPLY BRIEF IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

      **COMES NOW,** Defendant, Lieutenant Marquice Collins, Individually, by and through counsel, and files this, his Reply Brief in Support of Motion for Summary Judgment and, in support thereof, would show unto this Court as follows:

### Introduction

      Latoya Johnson seeks to impose liability for Robert Johnson's suicide on Jailer Marquis Collins. Latoya Johnson alleges Collins acted with "flagrant disregard" for what Latoya seeks to characterize as an obvious suicide risk.

      However, the facts are Defendant Collins dispatched his officers to observe Robert Johnson, and these officers reported back to Collins that Johnson was not in danger:

> Well, I asked them to check on the inmate. Well, they said -- when they got down there -- because I didn't know which inmate was involved -- they said inmates saying that Mr. Johnson was trying to harm himself... And at that time, I asked them to do a check, if he had any -- you know, they said -- the inmates said he had a razor and he was trying to harm himself. I told them, as part of due diligence, to do a check and see if he had any injuries and did he have a razor blade or that type of thing. **And they came back over the radio and said he was fine. There were no problems, that he wanted to stay in the dorm.** And that's when I communicated over the radio, I said, okay... **[Doc. 72-1]** at 29.

Collins ordered observations of Johnson not once, but twice, with Johnson ultimately being placed in an observation cell and monitored pursuant to policy. Sadly, Johnson took his own life, but this self-inflicted harm was not caused by any action of Collins that amounted to reckless disregard of a known suicide risk.

Plaintiffs urge the Court to deny summary judgment on the grounds that there is an alleged fact issue as to what Collins knew and when he knew it and the application and interpretation of policy once Johnson was placed in the observation cell.

It is respectfully submitted, there is no genuine issue of material fact precluding summary judgment. There is no jailer who can testify that he informed Collins that Johnson was a suicide risk. Collins states with certainty the jailers told Collins that Johnson was "fine"; the jailers all testified they observed, at worst, "scratches." It is also undisputed that following the initial checks instigated by Collins, Johnson was placed in R. 126 (the very same cell used for suicide detainees) and observed in the medical watch cell within the 15-minute window pursuant to the suicide watch policy.

For all of these reasons, summary judgment is warranted for Defendant Collins.

**I.      No Jailer Testified He Reported Cuts on Johnson's Arms to Collins.**

When pressed, no jailer could testify that Collins - who was manning the observation desk as was his duty - was told Johnson was at risk of suicide. Collins states unequivocally that he was not told Johnson was suicidal, and the jailers observing Johnson did not believe him to be suicidal.

For that reason alone, summary judgment is appropriate.

Officials will only be liable for episodic acts or omissions resulting in the violation of a detainee's clearly established constitutional rights if they "had subjective knowledge of a substantial

risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk." *Flores v. County of Hardeman*, 124 F.3d 736, 738 (5th Cir. 1997) ("A detainee's right to adequate protection from known suicidal tendencies was clearly established when Flores committed suicide in January 1990."). In *Jacobs v. West Feliciana Sheriff's Dep't*, the court found the determination of the objective reasonableness of particular conduct in light of the subjective deliberate indifference standard is a question of law for the court and explained the somewhat confusing relationship between the deliberate indifference and objective reasonableness standards as follows:

> for [an] appeal on qualified immunity, the subjective deliberate indifference standard serves only to demonstrate the clearly established law in effect at the time of the incident . . . . And under that standard-the minimum standard not to be deliberately indifferent- the actions of the individual defendants are examined to determine whether, as a matter of law, they were objectively unreasonable.
> *Jacobs*, 228 F.3d 388, 394 (5th Cir. 2000).

The court found it must determine whether, in light of the facts as viewed in the light most favorable to the plaintiffs, the conduct of the individual defendants was objectively unreasonable when applied against the deliberate indifference standard. *Id*. at 393-394.

Here, Collins had no subjective knowledge of any suicide risk. Further, even without knowledge of the risk of suicide, Collins' actions were objectively reasonable. The deputies he dispatched to observe Johnson reported back that he was "fine" and did not appreciate any suicidal tendencies.

For proof about Collins' knowledge about Johnson's suicide risk, Plaintiff cites to the following deposition excerpts:

Jailer Hall says he is "sure I would have" alerted Collins, Hicks says he "may have" alerted Collins and McCoy recalled telling Collins "he got a couple of marks." (See Hall Depo. at **[Doc. 72-**

3

**3]**, P26/L3-10, Hicks Depo. at **[Doc. 72-2]**, P46/L21-25; P47/L1-2, and McCoy Depo. at **[Doc. 72-4]**, P31/L4-6).

Plaintiff further cites to the first 9 lines of the below testimony, omitting the fact that Collins dispatched these officers to check on Johnson as there was a report of self-harm with the razor, not because officers saw a razor. In fact no razor was found, and what Collins was ultimately told by deputies was that there was no issue or suicide risk:

Q. Do you remember who it was who told you that he had a razor and had attempted to harm himself?

A. It was Unit 40 -- I'm sorry. It was either Unit 40 or 44. I can't remember. But it was one of those two.

Q. Can you use names rather than units because I don't have that --

A. Okay. Officer McCoy and Officer Hicks.

Q. So it was either of them or do you know it was --

A. It was one or the other.

Q. Okay. So it's either McCoy or Hicks tells you that there's a razor blade and he's attempting to harm himself?

A. Right. But as far as who responded that he was fine and there was no issue, it was Officer McCoy.

Q. Okay. Do you know whether they (P31/L1) confiscated the razor?

A. No, sir.

Q. Did you ever personally observe any marks on Mr. Johnson caused by the razor?

4

A. No, sir.

(See Collins Depo. at **[Doc. 72-1]**, P30-31).

Collins explains it was an inmate who alerted him there was an issue, and he sent jailers to check on the situation, and the jailers reported back that inmates were saying a fellow inmate was trying to harm himself:

> A. I was contacted via the intercom by one of the inmates that there was a situation in that particular dorm. It was hard to hear him say exactly what was wrong. But I could hear him say that he needed an officer down in the dorm and that's when I -- because I was in central control at the time. I dispatched all three of my officers that were on the interior of the facility to report to Dorm 2 for a possible disturbance.
>
> Q. Okay. We're going to look at a document that references, I think, Unit 44.
>
> A. 44 -- Unit 40, 44 and -- I forgot the other one. It's 46.
>
> Q. Those are individual units. So a unit doesn't mean multiple people or does it?
>
> A. It's multiple -- unit number is individ- -- is unique to each officer.
>
> Q. Okay. So unit to me, I might think five or six people.
>
> A. Right.
>
> Q. But a unit is actually one?
>
> A. It's really the officer's badge number.
>
> Q. Do you remember who Unit 44 was?
>
> A. Yes, Officer Hicks.
>
> Q. Hicks?

Collins Depo. at **[Doc. 72-1]**, P25.

Collins Depo. at **[Doc. 72-1]**, P29/L7-25:

Q. Okay. So you -- so you -- you dispatched some units to Dorm 2. What did you tell them they were to do?

A. Well, I asked them to check on the inmate. Well, they said -- when they got down there -- because I didn't know which inmate was involved -- they said inmates saying that Mr. Johnson was trying to harm himself.

Q. Okay.

A. And at that time, I asked them to do a check, if he had any -- you know, they said -- the inmates said he had a razor and he was trying to harm himself. I told them, as part of due diligence, to do a check and see if he had any injuries and did he have a razor blade or that type of thing. And they came back over the radio and said he was fine. There were no problems, that he wanted to stay in the dorm. And that's when I communicated over the radio, I said, okay,

Collins Depo. at **[Doc. 72-1]**, P32/L6-10:

THE WITNESS: Okay. At the time, there were no communicated injuries based on what -- my officers' assessment, so there was no need for me to check because they said he was fine and he had no injuries.

**All of the jailers testified that they could not recall exactly what Collins was told, leaving Collins with the only actual memory of the statements made to him:**

*Hicks*

Hicks admitted that he did not hear any fellow officer call Collins and report that Johnson was in fact suicidal:

6

> Q. Okay. So you didn't overhear Mr. Hall call Mr. Collins and say, Mr. Johnson is going to hurt himself or has hurt himself or is trying to hurt himself, correct?
>
> A. Right.

(See Hicks Depo. at **[Doc. 72-2]**, P66-68).

### *Hall*

Hall likewise testified he had no recollection about speaking to Collins about any marks observed on Johnson's arms:

> Q. My question to you is, as we sit here today, do you have a recollection of specifically speaking to Mr. Collins about any marks on Mr. Johnson's arms?
>
> A. No.

(See Hall Depo. at **[Doc. 72-3]**, P54/L6-10).

### *McCoy*

For McCoy, he testified that officers contacted Collins after observing Johnson but could offer no detail at all about the conversation:

> Q. Okay. Do you have any recollection what if anything you told Lieutenant Collins about the situation in Dorm 2?
>
> A. I think Sergeant Hall did, Aaron Hall.
>
> Q. Okay. And do you know what Officer Hall told Lieutenant Collins?
>
> A. I can't remember.
>
> Q. Do you know whether Officer Hall saw cuts or scratches on Mr. Johnson's wrists the first time you entered Dorm 2?
>
> A. Unh-unh.

Q. And I'll ask him, but I don't know if you -- you know, maybe y'all talked about it or if he's ever told you anything about, yeah, I saw those cuts the first time or anything like that.

A. I can't remember.

(See McCoy Depo. at **[Doc. 73-4]**, P25/L1-17).

McCoy further testified:

Q. (By Ms. Lee) So it was Mr. Hall -- it's your testimony that Mr. Hall contacted Mr. Collins, correct?

A. Correct.

Q. All right. And do you recall when Mr. Hall would have contacted Mr. Collins in the course of the events that you've described here today?

A. When we went in the dorm -- on the video she just -- she just showed. When we went in the dorm and when the inmate had took his hand – Andre Strong took his hand -- what's his name – Hall had contacted him on the radio.

Q.   On the radio?

A.   Yes, ma'am.

Q.   Do you recall what specifically Sergeant Hall told Lieutenant Collins on the radio?

(See McCoy Depo. at **[Doc. 73-4]**, P76/L9-25).

A. No, ma'am.

Q. Do you recall how long the conversation was?

A. No, ma'am.

Q. As we sit here today, you can't give any specifics what was stated on that radio call?

A. No, ma'am.

(See McCoy Depo. at **[Doc. 73-4]**, P76-77).

For his part, Collins was definitive; Collins did not see any marks on Mr. Johnson on the night in question and no officer communicated to Collins that Mr. Johnson had inflicted injury upon himself or was potentially suicidal. (See Collins Depo. at **[Doc. 72-1]**, P31-33.)

Moreover, all that any jailer would have reported to Collins was what they appreciated - superficial scrapes or marks, not an attempted suicide.

All of the jailers testified they thought Robert Johnson had scratched himself and was not suicidal. These officers testified that they saw marks on Johnson they deemed to be "scratches" and they did not believe Johnson was suicidal. Hicks called the marks a "scratch" and Hall referred to the marks as "superficial scrapes".

It was only logical for these same jailers, who believed Johnson was not suicidal, to report back to Collins, just as he testified, that Robert Johnson was "fine."

Hall Depo. at **[Doc. 72-3]**, P24/L21-25:

Q. Okay. And can you describe those marks on his wrists?

A. The best I can recall is just superficial scrapes to his wrists.

Q. Do you have -- did you learn with what instrumentality he made those marks on his wrists? Did he use a razor? Did he use a pencil?

Hall Depo. at **[Doc. 72-3]**, P25:

A. All I can -- I can say what the inmates said, but I don't know for sure.

9

> Q. What did the inmates say?
>
> A. They said it was a razor blade.
>
> Q. Did you ever find a razor blade --
>
> A. No.
>
> Q. -- near Mr. Johnson or in his possession?
>
> A. No.
>
> Q. What else did the inmates tell you about Mr. Johnson if anything?
>
> A. That's all I can remember.
>
> Q. Okay. So after you saw the marks on his wrist for yourself, did you contact Lieutenant Collins about the -- about Mr. Johnson's condition and specifically about the marks on his wrist?
>
> A. I don't recall.

(See Hall Depo at **[Doc. 72-3]**, P25-26).

> **Hicks identified the marks as "superficial" -**
>
> Q. Okay. And then did you look at the – you saw the cuts on his wrist?
>
> A. It wasn't very -- to me, it wasn't – you know, it was very superficial like -- unless he did more later, you know.
>
> Q. But you saw them at that point?
>
> A. Uh-huh, yes.

(See Hicks Depo. at **[Doc. 72-2]**, P28/L19-25).

In sum, Collins offers the only definitive testimony on the issue of what was relayed to him from the cell by jailers, i.e. that Johnson was "fine" and certainly not suicidal. Moreover, all jailers

10

agreed that what they observed was not a suicide risk, but an inmate who scratched himself. Collins cannot be charged with that which he has not seen or been told himself. Collins had no subjective knowledge of a suicide risk.

Collins knew that three of his jailers observed Johnson and found there to be no suicide risk. He accepted that report and those actions - dispatching officers to investigate and then taking their recommendation on the status of the inmate Johnson - were reasonable. Collins is entitled to qualified immunity.

This case is also easily distinguishable from *Jacobs v. West Feliciana Sheriff's Dep't*, 288 F.3d 388 (5 th Cir. 2000) cited by Plaintiff. In that case, it was un-controverted that the Defendants knew the female detainee was a suicide risk and she was placed on suicide watch.

However, in that case, the jail officials failed to check on her every 15 minutes (waiting at least 45 minutes to observe her) which was contrary to policy, and they gave her loose bedding in the suicide watch cell, which she ultimately used to take her life.

Those facts in *Jacobs* are not the facts here. There was no knowledge by Collins of a suicide risk. Johnson was, however, observed every 15 minutes just as he would have been under a suicide watch. Additionally, despite what Plaintiff alleges, Collins had no role in giving Mr. Johnson his shoelaces. There is absolutely no citation to the record for this statement.

Further, Plaintiff criticizes Collins for not checking Johnson himself, but it is undisputed that Collins' duty that night was in the Control Room where he was charged with monitoring all jail cameras:

Collins Depo. at **[Doc. 72-1]**, P45:

THE WITNESS: Okay. All right. Yeah. I disagree, because at that time, Mr. Johnson

11

wasn't considered suicidal. He was in there for behavioral issues because of the commotion that was going on in the zone and the resistance and erratic behavior toward the officers. So being watched in realtime, we do not have the ability to watch an inmate realtime because a central control operator has those duties. And that's why we have to do it every 15 minutes. That's not practical.

Q. (By Mr. Johnson) Because -- because you have the same person tasked with watching 126 --

A. Right.

Q. -- and watching all of the videos?

A. That's correct.

Q. So there's a lot of those.

A. Right.

Q. And your back is to the window, right?

A. Correct -- well, it's to the left -- to the side.

Q. So if you're looking forward --

A. Well, it could be to the back. It's

Collins Depo. at **[Doc. 72-1]**, P46:

depending on the direction the central control operator is seated.

Q. So if you're looking at the screens --

A. Right.

Q. -- as is your job --

A. Correct.

12

Q. -- you can't see 126?

A. Correct.

Q. So thus the impossibility?

A. Right.

Collins is entitled to qualified immunity. While the death of Mr. Johnson is tragic, there can be no liability imposed on Collins when he was(1) alerted to a potential issue with Johnson and responded by (2) ordering jailers to observe Johnson. Once observed, the report received by Collins was that there was no risk of serious medical harm.  In other words, the officers involved did not believe Mr. Johnson was suicidal, and they did not report Johnson was suicidal to Mr. Collins.

This case is also distinguishable from Plaintiff's other cited authority,  *Speck v. DeSoto County* 2012 U.S. Dist. LEXIS 93419 (N.D. Miss. July 5, 2012).  In that case, the arresting police officers notified jailer Thompson of their concern for the deceased detainee Allen. Officer Pieh testified that he told Thompson that Allen stated that her "life was over" and that she was going to kill herself and that Allen needed to be watched; Officer Spooner testified that he told Thompson that Allen had been to Lakeside for suicidal behavior and she needed to be watched. Thompson testified that she was told to watch Allen because "she could try to hurt herself."

Despite these warnings, Allen was not put on a suicide watch and was placed in a cell with her belt, leather bracelet, and shoelaces, which she ultimately used to take her life.

The court denied summary judgment as to jailer Thompson finding there was a genuine issue of material fact as to whether Thompson acquired subjective knowledge of Allen's substantial medical risk. There was also no documentation that Thompson observed Allen either and at what frequency.

*Speck* and this case are far afield. Here again, there was no question in *Speck* that the jailer was told there was a suicide risk, that the detainee had recently been hospitalized for suicidal issues and announced she was going to kill herself. Then, despite these warnings, Thompson put her in a regular cell with a belt and shoelaces and had no documentation of her observations.

The same is not true here. Collins was not subjectively aware of a suicide risk. In fact, he was told there was no risk. Despite this, Collins still put Johnson in an observation cell and observed him according to the suicide watch policy, which was every 15 minutes.

An officer need only plead his good faith which then shifts the burden to the plaintiff who must rebut the defense by establishing that the officer's allegedly wrongful conduct violated clearly established law. *Salas v. Carpenter*, 980 F.2d 299 (5th Cir. 1992); *Pierce v. Smith*, 117 F.3d 866 (5th Cir. 1997)). In short, the defendant officer need not prove the qualified immunity defense. Rather it is the plaintiff who bears the burden of negating the defense. See *Id.* To do so, plaintiff cannot rest on conclusory allegations and assertions but must demonstrate genuine issues of material fact regarding the reasonableness of the officer's conduct. *Id*.

Here, Plaintiff can point to no established law Collins violated. Plaintiff cannot show Collins knew there was a risk of suicide and ignored it. The cases cited by Plaintiff deal with known suicide risks where officers clearly knew the risk and then failed to properly observe the inmate. Here, Collins was not aware of the risk, but still properly observed Johnson

Collins also did not purposely allow any shoelaces to be maintained by Collins inside the cell. Even if he did, such an action would amount to negligence only as he did not know Johnson was suicidal, which would not foreclose qualified immunity. The defense of qualified immunity protects "all but the plainly incompetent or those who knowingly violated the law." *Malley v. Briggs*, 475

14

U.S. 335, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)). Mere accidents, negligence, and mistakes of judgment will not suffice to expose an officer to personal liability. *Id*.

## II.     Collins' Observations of Johnson Followed Policy and were Reasonable.

Moreover, Collins' observations of Johnson followed KNRCF policy with regard to suicide detainees. Johnson argued there is a fact issue as to whether the observations were according to policy, but there is no question, Defendant Collins actually observed Mr. Johnson every 15 minutes, which would have been the protocol even for an inmate believed to be suicidal.

Collins, in fact, observed Johnson within the 15 minute window; Sheriff Moore affirmed that Collins' observation of Johnson every 15 minutes was according to Mississippi Department of Corrections policy for a "suicide watch" even though Johnson was not placed in 126 because Collins feared he was going to harm himself. (See Sheriff Moore Depo. at **[Doc. 72-5]**, P75-76). Warden Crockett also testified the time frame to observe - even if suicidal - was every 15 minutes, which is precisely what Collins did in this case. See Exhibit "F", Deposition of Warden Crockett, P19/L3-21.

Johnson seems to suggest there somehow could have been "constant" observation of Robert Johnson, but such a protocol would be impossible for Collins to have implemented. Collins was in the control room of the jail and charged with monitoring 50-60 jail cameras along with Johnson, whom he had to visually observe in Rm. 126:

As shift supervisor, Collins was charged with manning the Control Room, a post he could not leave unless he was relieved by another officer.

Moreover, Collins had no role in "giving" Johnson the shoelaces Johnson ultimately used to take his own life, and there is no record citation by Plaintiff supporting that allegation.

For all of these reasons, dismissal of Collins is proper.

15

## Conclusion

Collins had no subjective knowledge of a substantial and significant risk that Mr. Johnson would take his own life. The facts in this case are that Collins was alerted by an inmate who called Central Control to tell Collins they needed an officer in Dorm 2. (See Complaint, **[Doc. 1]** at p. 2). Collins dispatched officers to see if there were any issues in Dorm 2.

Upon arrival, the officers who were dispatched reported to Collins that Johnson was "fine" and there were no issues. The officers can offer no conflicting evidence and confirmed that they only believed Johnson had "scratched" himself and was not suicidal; thus, they felt no reason to alert Collins that Johnson needed more observation or attention.

In sum, Defendant Collins had no knowledge there was any suicide risk.

Moreover, even if there was a suicide risk for Johnson which Collins was subjectively aware of, as a suicide risk, Mr. Johnson would have been placed in the observation cell and monitored every 15 minutes, which is precisely what happened in this case.

For all of these reasons, Defendant Collins is entitled to summary judgment.

**RESPECTFULLY SUBMITTED** this the 29th day of March, 2022.

        **JACKS | GRIFFITH | LUCIANO, P.A.**

By:   */s/ Jamie F. Lee*
     Jamie F. Lee, MS Bar No. 101881
     Daniel J. Griffith, MS Bar No. 8366
     Mary McKay Griffith, MS Bar No. 100785
     *Attorneys for Lieutenant Marquice Collins,*
     *Individually*

Of Counsel:

**JACKS | GRIFFITH | LUCIANO, P.A.**
150 North Sharpe Avenue
P. O. Box 1209

Cleveland, MS 38732
Phone No. 662-843-6171
Fax No. 662-843-6176
Email: jamie@jlpalaw.com
          dgriffith@jlpalaw.com
          mgriffith@jlpalaw.com

**CERTIFICATE OF SERVICE**

I, Jamie F. Lee, attorney of record for Defendant Lieutenant Marquice Collins, do hereby certify that I have this day caused a true and correct copy of the above and foregoing *DEFENDANT'S REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT* to be delivered by the ECF Filing System which gave notice to all counsel of record.

THIS, the 29th day of March, 2022.

　　　　　　　　　　　　　　　　　　　　*/s/ Jamie F. Lee*
　　　　　　　　　　　　　　　　　　　　Jamie F. Lee